RKG MANAGEMENT, LLC *v.* ROSWELL SEDONA
ASSOCIATES, INC., ET AL.
(AC 33920)

Beach, Sheldon and Bishop, Js.

Argued January 16—officially released May 7, 2013

*Peter C. Hunt*, for the appellants (defendant Thomas Killackey et al.).

*Tamera S. Fisher Byun*, for the appellee (plaintiff).

*Opinion*

BISHOP, J. The defendants, Thomas Killackey and the Maidenstone Trust, appeal from the judgment of strict foreclosure of a mechanic's lien rendered in favor of the plaintiff, RKG Management, LLC,[1] specifically

---

[1] We note that throughout the proceedings the plaintiff has been identified as both RKG Management, LLC, and RKG Associates, LLC. This case is captioned here as indicated in the summons and complaint in the trial court.

with respect to the court's conclusion that the plaintiff was entitled to a mechanic's lien in the amount of $40,130 for labor and materials supplied to property owned by the defendants.[2] On appeal, the defendants claim that the judgment must be reversed because the court incorrectly deprived them of the right to cross-examine the plaintiff's key witness at trial and thereafter refused to grant the defendants' request that the witness' testimony be stricken. We agree and reverse the judgment of the trial court.

The following facts and procedural history is relevant to our consideration of the issues on appeal. By complaint dated November 22, 2006, the plaintiff sought to foreclose a mechanic's lien it had caused to be filed on property then owned by the named defendant, Roswell Sedona Associates, Inc., or its successors in title, Killackey and the Maidenstone Trust.[3] In its complaint, the plaintiff alleged that, pursuant to a contract, it had

---

[2] This action was originally filed against Roswell Sedona Associates, Inc., Killackey (principal or agent of Roswell Sedona Associates, Inc.), Dynamic Mortgage Bankers, Ltd. (holding a mortgage from Thomas Killackey as personal guarantor and Roswell Sedona Associates, Inc., which mortgage was later assigned to Bayview Loan Servicing, LLC), Greenpoint Mortgage Funding, Inc. (holding a mortgage from Killackey), Kenneth D. Robinson III (a member of Roswell Sedona Associates, Inc.), and the Maidenstone Trust (a Killackey entity). Most of these defendants, including Roswell Sedona Associates, Inc., were defaulted before trial or, by stipulated agreement with the plaintiff, were removed as defendants. The only defendants to this appeal are Killackey and the Maidenstone Trust.

[3] According to the defendants' pleadings, Roswell Sedona Associates, Inc., was, at one point, the owner of the two parcels subject to the mechanic's lien and that, at a later date, Killackey became the owner of parcel one and the Maidenstone Trust became the owner of parcel two. The exact ownership of the two parcels was not determined by the court in its memorandum of decision, which stated that "[c]onfusion arose concerning ownership of both parcels." Instead, as it stated in its articulation dated April 2, 2012, the court ultimately proceeded under the conclusion that the subject property "was owned and controlled by one or more of the defendants." Because ownership of the parcels is not in dispute in this appeal, we proceed on the basis of the court's conclusion that the defendants to this appeal own the subject properties.

supplied materials, labor and services in connection with the construction of improvements on two parcels presently owned by the defendants and for which it was owed the sum of $100,032, exclusive of interest and costs. The plaintiff further alleged that, notwithstanding its fulfillment of its obligations under the contract and having billed the defendants, they had failed and refused to pay the balance due to the plaintiff. Accordingly, the plaintiff sought strict foreclosure of the mechanic's lien and other relief.

In their answer, the defendants admitted the ownership of the parcels and the existence of an agreement for the performance of work on the property, but claimed, generally, that the plaintiff had not performed services in a workmanlike manner and in accordance with the terms of the contract. By way of affirmative defense, the defendants alleged that the contract was not enforceable because it did not conform to the dictates of the Home Improvement Act, General Statutes § 20-418 et seq. The defendants' second affirmative defense claimed that no balance was due to the plaintiff. The defendants filed a counterclaim as well in which they alleged that the plaintiff had violated the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., in the execution of the contract, a misstep for which the defendants sought an award of reasonable attorney's fees. The plaintiff, in turn, denied the material allegations contained in the special defenses and counterclaim.

A trial to the court in the matter commenced on October 15, 2008, when John Hudson, an attorney, testified for the plaintiff regarding title to the parcels under foreclosure. His testimony did not relate to the nature or value of services the plaintiff claimed to have performed. On the next trial day, October 17, 2008, Richard Gillotte, the sole member of the plaintiff, testified on direct examination regarding the services he claimed

to have performed at the site, including the character and extent of his work, the materials furnished and the costs for labor and materials he claimed were incurred by the plaintiff in performance of its contractual obligations. In conjunction with his testimony, Gillotte was questioned extensively in regard to documents, most of which counsel for the parties previously had agreed could be marked as full trial exhibits.[4] Gillotte's direct testimony occupied the entire day and was scheduled to resume when the court reconvened for the matter. The next trial date was October 21, 2008, but Gillotte was unable to testify because of a medical condition involving his voice, and his testimony was postponed until October 24, when he again was medically unable to testify. On the next scheduled trial date, October 29, 2008, counsel for the plaintiff requested a continuance on the basis that Gillotte was not able to appear in court because he would lose his job if he had to take any more time off work that week. The court denied the motion for a continuance; instead, the court permitted the plaintiff to call its other witnesses out of order and the court ordered the defendants to proceed with their defense out of order before the completion of Gillotte's testimony. In response, the defendants objected and asked the court to enter a nonsuit against the plaintiff for Gillotte's failure to appear and be subject to cross-examination. The court denied this motion.

---

[4] The plaintiff makes the unpersuasive argument on appeal that because the defendants had agreed that these exhibits could be premarked as full exhibits, their contents, alone, constitute sufficient evidence to sustain the plaintiff's burden of proof. In making this argument, the plaintiff conflates the admissibility of these documents with any finding as to their accuracy, reliability and completeness or, in any case, with the degree of their probative value. Notwithstanding the admission into evidence of these documents, counsel for the defendants should have been afforded the opportunity to examine Gillotte in regard to these documents. We will not assume that the defendants agreed to have these documents premarked with an awareness that their accuracy, completeness or reliability would not be subject to scrutiny on cross-examination of the chief proponent of their probative value.

Thereafter, the plaintiff called Killackey to testify. A review of the record reveals that the examination of Killackey on October 29, by the plaintiff, focused largely on matters of ownership and configuration of the titles, with minimal questioning regarding the plaintiff's engagement to perform services at the site.

The court next convened on November 7, 2008, when, apparently, Killackey's direct examination was completed and cross-examination had begun.[5] At a later trial date, on December 12, 2008, Gillotte was again not present. His reason, stated by counsel, was that he could not afford to jeopardize his employment by being absent. Counsel for the plaintiff requested another continuance, arguing, in part that: "Mr. Gillotte being the sole member of the plaintiff . . . his testimony is essential to completing the establishment of plaintiff's case." The court denied the plaintiff's request for a continuance and ordered that the case proceed with Killackey's cross-examination. Following Killackey's testimony, counsel for the plaintiff offered a document purporting to be an affidavit of debt completed by the plaintiff. Although the defendants objected to the document's admissibility on hearsay grounds, the court overruled the objection and allowed the document into evidence. The plaintiff then rested.

In response, the defendants asked the court to enter a judgment of dismissal pursuant to Practice Book § 15-8 on the basis that the plaintiff had not established a prima facie case and that the plaintiff's principal was absent from the trial. Referring to counsel for the plaintiff, the defendants argued: "[S]he can't prove a case if her client fails to show up in court." In response, counsel for the plaintiff argued, in regard to Gillotte's direct

---

[5] Although the plaintiff correctly points out that the defendants have not provided the court with a transcript of the November 7, 2008 proceeding, it is clear from counsels' recitation in the December 12, 2008 proceeding, that Killackey's testimony had consumed the day.

testimony: "My client did put on evidence. The plaintiff did put on evidence as to all the items owed and a spreadsheet was admitted as an exhibit as to the items claimed to be owed. The affidavit of debt merely boils down [to] evidence already admitted . . . [and exhibit] number 120 [the spreadsheet] was admitted by consent, and, therefore, I think there is a factual basis, again, for plaintiff's motion for judgment of foreclosure by sale to enter." As part of the colloquy in this regard, the defendants' counsel remarked, in response to the plaintiff's claim that its case had been proven by the submission of a spreadsheet of work performed and bills paid and not paid, that, "Your Honor, may I just add one other matter? It's a list of bills he paid. He claims he paid them because Mr. Killackey said he would reimburse him. I'm not trying to controvert them. I don't have the opportunity to do so at this point because they haven't produced the plaintiff—Mr. Gillotte to enable me to do that."

The court reserved judgment on the defendants' motion to dismiss and ordered the defendants to proceed with their evidence. Following the close of the defendants' case, the parties again argued the defendants' motion to dismiss. In response, counsel for the plaintiff argued that the plaintiff had produced sufficient evidence to sustain its burden. Counsel argued: "If you were to believe and find credible Mr. Gillotte's testimony, I believe you would find that moneys are outstanding and owing and were for work done on the property . . . ." The trial concluded with direction to counsel to submit posttrial briefs and proposed findings of fact.

The defendants filed their posttrial brief on May 25, 2008, in which they, again, raised the issue of their inability to cross-examine Gillotte. Specifically, the defendants argued: "First, the defendants respectfully request that the court strike Gillotte's testimony in its

entirety because defendants did not have the opportunity to cross-examine him." Thereafter, on March 6, 2009, counsel for the parties presented argument to the court during which the defendants' counsel stated: "Your Honor, I must stress, again, you have the discretion to disallow Mr. Gillotte's testimony in its entirety. I believe that it would be fundamentally unfair to my client and might violate his procedural due process rights if you give him the benefit of the doubt at the very least. We didn't have time to cross-examine him. He didn't make his case even unopposed, okay." Counsel argued, as well: "We had no opportunity to cross-examine Mr. Gillotte about that. We had no opportunity to cross-examine him to explain how he could claim to be a subcontractor when he was the one that hired Joe Grant, Gerald Grant, Nick Gillotte. He hired all of those people. And if we had the opportunity to question him about this, I believe we would be able to easily show that his case not only has no merit . . . he would subject himself to liability for bringing a totally frivolous lawsuit. But we don't have that opportunity because he brought it to trial and then decided that he could not show up and could not take time off from work." Finally, in this regard, counsel argued: "I do not have the opportunity to cross-examine the affidavit of debt. As far as I'm concerned, Your Honor, this was a gross abuse of the legal process by Mr. Gillotte, and it was a waste of everybody's time by calling us up here and then not showing up in court."

Thereafter, by memorandum of decision dated April 6, 2009, the court rendered a partial judgment as to liability only, finding the value of services rendered by the plaintiff to be $40,130, which amount properly attached through the mechanic's lien to one of the parcels only. The court did not address the failure of Gillotte to reappear at trial, the defendants' missed opportunity for cross-examination, or their attendant

request that Gillotte's testimony be stricken. Thereafter, the court rendered judgment of strict foreclosure, and this appeal followed.

The centrality of the right to cross-examination to our system of jurisprudence cannot be overstated. As the United States Supreme Court has observed: "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg* v. *Kelly*, 397 U.S. 254, 269, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970). Our Supreme Court has similarly stated: "The test of cross-examination is the highest and most indispensable test known to the law for the discovery of truth. Professor Wigmore summarizes our own conviction and experience, when he says: For two centuries past, the policy of the Anglo-American system of evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law." (Internal quotation marks omitted.) *Fahey* v. *Clark*, 125 Conn. 44, 46, 3 A.2d 313 (1938). Our Supreme Court stated as well: "A fair and full cross-examination of a witness upon the subjects of his examination in chief is the absolute right, and not the mere privilege, of the party against whom he is called, and a denial of this right is a prejudicial and fatal error. It is only after the right has been substantially and fairly exercised that the allowance of cross-examination becomes discretionary with the trial court." (Internal quotation marks omitted.) Id., 47–48. So integral to our system of justice is the right of cross-examination that our Supreme Court has opined that when the right is denied, the affected party has a right to have the untested direct testimony stricken. *Gordon* v. *Indusco Management Corp.*, 164 Conn. 262, 271, 320 A.2d 811 (1973).

Although our Supreme Court has not explicitly cloaked the right of cross-examination in the civil context in constitutional raiment, dicta from one opinion

points in that direction. In *Society for Savings* v. *Chestnut Estates, Inc.*, 176 Conn. 563, 409 A.2d 1020 (1979), a case involving the right of defendants in a foreclosure action to challenge property valuations completed ex parte by court appraisers; id., 565–66; the court, citing *Goldberg* v. *Kelly*, supra, 397 U.S. 269, opined that: "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."[6] (Internal quotation marks omitted.) *Society for Savings* v. *Chestnut Estates, Inc.*, supra, 574. But, whether constitutional or not, the teaching of these cases and the tradition upon which they are founded is that the right to cross-examination is central to our system of justice and its complete denial entitles the party adversely affected to have testimony untested by cross-examination stricken and thus not considered by the fact finder.[7]

---

[6] In *Struckman* v. *Burns*, 205 Conn. 542, 549, 534 A.2d 888 (1987), however, our Supreme Court declined to answer the question, of whether the right to cross-examination in a civil case is protected by the constitution, on the basis that resolution of the underlying claims did not require the court to do so. See also *Pet* v. *Dept. of Health Services*, 207 Conn. 346, 542 A.2d 672 (1988), in which the court rejected the plaintiff's constitutionally based claim regarding the deprivation of the right of cross-examination, not on the basis of the plaintiff's characterization of the right, but, rather, because the court found, from the record, that the plaintiff had been provided a right, albeit limited, to cross-examine the witness in question.

[7] We are mindful that in *Ann Howard's Apricots Restaurant, Inc.* v. *Commission on Human Rights & Opportunities*, 237 Conn. 209, 218, 676 A.2d 844 (1996), our Supreme Court cited, with apparent approval, C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 3.4.3, for the proposition that: "If a witness testifies on direct examination but then becomes unavailable for cross-examination because of illness or death, the court has discretion to choose one of the following options: (1) to declare a mistrial, (2) to strike the direct, or (3) to allow the direct to stand." (Internal quotation marks omitted.) While this dicta appears to be in conflict with the holding of other cases that one deprived of the opportunity for cross-examination has the absolute right to have the direct testimony stricken; see *Gordon* v. *Indusco Management Corp.*, supra, 164 Conn. 271; the present case does not oblige us to choose which view prevails, as there is no claim here that Gillotte, ultimately, was unavailable for cross-examination on account of illness or death.

Thus, it is clear that the court in the present case should have stricken Gillotte's testimony. That conclusion, however, does not end our inquiry as the plaintiff claims on appeal that it is entitled to judgment notwithstanding the court's failure to strike Gillotte's direct testimony. The plaintiff asserts that there was sufficient documentary evidence and testimony from other witnesses to sustain the judgment and, moreover, that the defendants cannot demonstrate the contrary.[8] Indeed, it appears to be settled law that even if a party is entitled to have the direct testimony of a witness stricken, it does not necessarily follow that the moving party is also entitled to judgment. Rather, in considering whether to reverse a judgment entered after a party has been deprived of the right of cross-examination, a court, on review, should assess whether the improperly admitted testimony was merely cumulative of other validly admitted testimony. See *Ann Howard's Apricots Restaurant, Inc.* v. *Commission on Human Rights & Opportunities*, 237 Conn. 209, 223, 676 A.2d 844 (1996). As Justice Marshall of the United States Supreme Court has noted, it is particularly difficult for an appellate court to determine whether a denial of cross-examination was harmless. See *Delaware* v. *Van Arsdall*, 475 U.S. 673, 687, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) (Marshall, J.,

---

[8] We are aware that there is an issue regarding the burden of proof on the question of harm. The plaintiff asserts that the defendants bear the responsibility to demonstrate that there was insufficient evidence apart from Gillotte's testimony to sustain the court's judgment. On the other hand, if cross-examination is a due process right protected by the constitution, it would be the plaintiff's burden to demonstrate that the court's failure to strike Gillotte's testimony was harmless. See *State* v. *Golding*, 213 Conn. 233, 241, 567 A.2d 823 (1989) (state has burden of demonstrating harmlessness of trial court error of constitutional proportion); *Bruno* v. *Bruno*, 132 Conn. App. 339, 348, 31 A.3d 860 (2011) (affirming *Golding*'s applicability to civil proceedings). In the present case, we need not opine on that interesting issue because, on the basis of our review of the record, it is abundantly clear that Gillotte's testimony and the documents his testimony supported represented the heart of the plaintiff's case and the basis of the court's judgment.

dissenting). "The centrality of cross-examination to the factfinding process makes it particularly unlikely that an appellate court can determine that a denial of cross-examination had no effect on the outcome of a trial.

"[T]he court ordinarily cannot measure whether harm has ensued to an appellant when he has been denied the opportunity to cross-examine witnesses against him, given all the risks. Had cross-examination been allowed, for example, it might have served to impeach a witness and thus to cast doubt on corroborating testimony, or it might have elicited exculpatory evidence. Only on rare occasions will an appellate court be able to find that the testimony of the witness was so tangential, or so well corroborated, or so clearly invulnerable to attack that the denial of the right to cross-examination was harmless." (Internal quotation marks omitted.) Id.

From our review of the record, it is abundantly clear that Gillotte's testimony was significant to the plaintiff's case. Consuming an entire day of trial, Gillotte's direct testimony set forth the plaintiff's claims regarding the character, quality and value of services he claimed to have provided to the defendants. Additionally, Gillotte gave testimonial support to numerous fact-laden documents in support of the plaintiff's monetary claims. We contrast the facts in the present case with those found in *Ann Howard's Apricots Restaurant, Inc.*, supra, 237 Conn. 209, in which our Supreme Court concluded that the testimony of the witness who was unavailable for cross-examination was cumulative of similar testimony from other witnesses as to liability, but that the witness' testimony regarding damages was unique. Id., 223. Thus, the court held that because the plaintiff was unable to cross-examine the sole witness who testified regarding damages, the hearing officer abused her discretion in failing to strike the testimony and, consequently, the court ordered a new hearing on the issue of damages. Id., 224, 233. Attempting to analogize the evidence in

the present case with the liability evidence in *Ann How-ard's Apricots Restaurant, Inc.*, the plaintiff argues that there was sufficient, properly admitted evidence to sustain the court's judgment. In support of this argument, the plaintiff points to the "host of exhibits" that had been admitted by agreement during Gillotte's testimony including a spreadsheet upon which the court later stated it relied in formulating its judgment.[9] The plaintiff claims, as well, that the court could have gleaned evidence from Killackey's testimony to support its judgment. As to the exhibits, we already have noted that the defendants' agreement for the admission of those exhibits does not stand as a concession to their completeness, accuracy or probative value. See footnote 4 of this opinion. As the defendants argued in urging the trial court not to consider Gillotte's testimony, they could not cross-examine a spreadsheet or an affidavit of debt. The same is true for any of the dozens of exhibits counsel had agreed could be marked as full exhibits either before or during Gillotte's testimony. Finally we are not persuaded by the plaintiff's claim, without reference to any particular evidence, that Killackey's testimony, alone, could have provided the court a basis for its judgment. Rather, we find significance in the court's explicit reference to exhibit 120, the spreadsheet, as the basis for its determination of the amount of the mechanic's lien that it granted. This finding belies the claim that the court relied on Killackey's testimony as a source of damages information.

For reasons akin to those expressed by the court in reversing the judgment as to damages in *Ann Howard's*

---

[9] In its articulation dated April 2, 2012, the court stated: "The amounts that the court relied on as probative evidence were derived from the Plaintiff's Exhibit #120, a spreadsheet showing an itemization of checks and amounts paid for labor and certain material presumably related to Parcel B. The court relied on this spreadsheet as a basis for the finding that $40,120 (rounded down from $40,133.81) was due for work, services, and/or material supplied to a particular part of the subject premises."

*Apricots Restaurant, Inc.*, supra, 237 Conn. 224, the judgment in the present case cannot stand. The defendants here were deprived of a fair opportunity to cross-examine a crucial witness against them and to probe the accuracy, completeness or probative impact of any of the documents admitted through Gillotte's testimony and later utilized by the court in finding against the defendants. Without that opportunity, and in the absence of showing that Gillotte's testimony was merely cumulative, the court's failure to strike Gillotte's testimony cannot be viewed as harmless.

The judgment is reversed and the case is remanded for a new trial.[10]

In this opinion the other judges concurred.

---

[10] The defendants argue that the judgment should be reversed, but that the case should not be remanded for a new trial. We disagree. In assessing the sufficiency of evidence to sustain a judgment, we look both to the properly and improperly admitted evidence at trial. See *State* v. *Ricketts*, 140 Conn. App. 257, 261 n.1, 57 A.3d 893 (2013). In this instance, the plaintiff's evidence, including testimony which should have been stricken, was adequate to sustain the court's judgment.